# ROSADO v. PONCE RAILWAY AND LIGHT COMPANY.

## APPEAL from the District Court of Ponce.

### No. 765.—Decided June 25, 1912.

APPEAL—CONCLUSIONS OF TRIAL JUDGE—MANIFEST ERROR—NEW TRIAL.—The conclusions of the trial judge should agree with the facts as they appear in the statement of the case, otherwise it cannot be held that the judgment is supported by the facts. If the court has made erroneous deductions from the facts as the same are stated and certified by the judge, the latter has committed a manifest error which requires the reversal of the judgment appealed from and the granting of a new trial.

PLEADINGS—MANAGER OF A CORPORATION MAY VERIFY PLEADINGS.—In accordance with sections 118 and 132 of the Code of Civil Procedure the manager of a corporation has power to swear to the answer to a complaint, especially when in the oath he states that he has a better knowledge of the facts than any other person.

ID.—AMENDMENTS—DISCRETION OF COURT—APPEAL.—Courts have the discretional power of allowing the amendment of the affidavit to an answer to a complaint and this court will not interfere with the exercise of said discretional power by the trial court unless it is shown that the same has been abused.

AMENDMENTS—ERROR.—When the trial court allows the amendment of an affidavit but the amendment is not made by the interested party and both act in the belief that the amendment was made, any error that may have been committed by the court in connection with such amendment is unimportant.

RES GESTAE—EVIDENCE—ANTE MORTEM STATEMENTS.—The statements made by the injured party to his physician long after the accident occurred cannot be considered as part of the *res gestae*, therefore the testimony of said physician relative to such statements is not admissible.

EVIDENCE—EXPERT TESTIMONY—ADMISSION BY DEFENSE OF QUALIFICATION OF EXPERT.—The defendant's attorney having admitted the expert qualification of a physician to testify as to the minimum intensity of an electric current necessary to produce the mortal wounds and burns received by the injured person, said attorney cannot move to strike out the answers given by said witness on the same subject when cross-examined by counsel for the plaintiff on the ground that the competency of the witness to testify as an expert on said subject was not shown.

ID.—HYPOTHETICAL QUESTIONS.—Hypothetical questions are admissible only when based on facts already established at the trial.

ID.—STRIKING OUT EVIDENCE—ERROR—ESSENTIAL QUESTIONS.—Error is committed by a court which strikes out part of the testimony of a witness which tends to show the degree of dampness of the place where the injured party received the burns produced by an electric current when the result of the conclusions of the trial court is that the failure to prove the degree of dampness of the place where the accident occurred, bearing in mind that dampness increases the intensity of an electric current, is an essential question.

RES IPSA LOQUITUR—ERROR.—The principle of *res ipsa loquitur* is applicable to this case and the trial court committed error in not applying the same.

NONSUIT—DEMURRER TO EVIDENCE—DUTY OF COURTS.—In deciding a motion for nonsuit on the ground of the insufficiency of the plaintiff's evidence the court should admit as true all the facts to which the evidence introduced by the plaintiff refers. Sustaining a motion for nonsuit is equivalent to rendering a judgment on a demurrer to the evidence introduced by the plaintiff and courts should allow such motions with great care and only in cases where the propriety of granting such motion is perfectly clear.

NONSUIT ON COURTS'S OWN MOTION.—When the allegations and the evidence introduced by the plaintiff justify such action a court may render a judgment of nonsuit on its own motion.

NEGLIGENCE—LIABILITY FOR ACCIDENT—INSULATION OF ELECTRIC WIRES.—It is an imperative duty of an electric light company engaged in furnishing electricity by means of wires stretched upon posts placed along the streets of a city to keep said wires constantly insulated so as to prevent their coming in contact with other objects. Failure on the part of the company to comply with this duty constitutes an act of negligence no matter what may be the causes and acts which occasion the contact of the wires with other objects.

CONTRIBUTORY NEGLIGENCE—LIABILITY FOR ACCIDENT—IMMEDIATE CAUSE OF ACCIDENT.—Although a laborer may not employ the safest means to pass over electric wires which are supposed to be insulated he is justified in supposing that the company had complied with its duty by keeping the electric wires completely insulated and if said laborer passes at the place which he considers most convenient he is not guilty of contributory negligence.

ID.—DUTY OF ELECTRIC LIGHT COMPANY.—In the case at bar it was held that the deceased was not guilty of contributory negligence in passing a telephone wire over the electric wires of the defendant company which, it was to be supposed, did not carry an electric current stronger than 110 volts as they were devoted to the electric lighting of the city of Ponce, and that the deceased had the right to believe that the defendant company had complied with its duty by keeping its electric wires completely insulated whereby said company could have prevented the accident.

ID.—DAMAGES—REASONABLE CARE AND PRUDENCE.—Even supposing that the person who suffers an accident is guilty of contributory negligence, this fact does not bar him from obtaining indemnity for the damages sustained on account of the accident if the same could have been prevented by reasonable care and prudence on the part of the defendant.

PUBLIC SERVICE CORPORATIONS—REASONABLE CARE.—Public service corporations working under important franchises are bound to comply with their duties towards other companies, its employes and the general public in such a manner as reasonably to prevent causing them injury through the dangerous means used in carrying out such public services.

ID.—ELECTRIC WIRES—LACK OF ADEQUATE INSULATION—CRIMINAL NEGLIGENCE.—The fact that for seven years the defendant company allowed the electric wires which caused the accident in the case at bar carrying an electric current of intensity sufficient to cause the death of any person who touched said wires, to remain bare and uninspected is almost criminal negligence and renders said company liable for the death of the deceased.

The facts are stated in the opinion.

*Mr. José A. Poventud* for appellant.

*Messrs. Hartzell and Rodríguez Serra* for respondent.

Mr. Justice MacLeary delivered the opinion of the court.

This action was brought on behalf of María Luisa Rodríguez y Rosado, the infant daughter of Ramón Rodríguez Vázquez, by Petra Rosado y Correa, her mother, to recover damages for the death of her father, Ramón Rodríguez Vázquez, which is alleged to have been caused by the negligence of the defendant through its agents and employes. On August 1, 1911, judgment was rendered against the plaintiff, on motion of defendant for a nonsuit, dismissing the complaint for lack of evidence to prove the allegations thereof, and casting the losing party in the costs. The court, as a basis for the judgment, made the following findings of fact which it is deemed expedient to set out at length, to wit:

"First. The court finds that Petra Rosado y Correa was lawfully married to Ramón Rodríguez Vázquez, now deceased; that they are the parents of the minor, María Luisa Rodríguez y Rosado, who is likewise the heir of Ramón Rodríguez Vázquez, together with her minor sister, who was unborn at the time of her father's death, and also at the date of the filing of the complaint which is the object of this suit.

"Second. The court finds that Ramón Rodríguez Vázquez was a man 20 years of age, of strong and healthy constitution, who took care of and supported his family by his earnings, viz., the money he received daily—$1—for a period of nearly two years, from the South Porto Rico Telephone Company of the City of Ponce; said family— that is, his wife and daughter—exclusively depending upon him for their support.

"Third. The court finds that on October 10, 1910, on Royal Street or road of Playa de Ponce and opposite to house No. 28 of said street, there were two electric wires connecting said house with the general wire furnishing electric current to the lights of the private residences; that said two wires thus connecting said house had an electric current or power of unknown intensity; that they were covered with a protecting or insulating matter of unknown nature which at some places was destroyed, the wires showing some small decortications or pluck-

ings that could be perfectly noticed at first sight by any person standing on the street under the said two wires by simply looking at them; that the intensity of the current usually passing through the wires furnishing light· to the private residences is of 110 volts; that the intensity of the current in the primary wires before entering the transformers or adequate apparatus for reducing the intensity of electric currents, and of which two large ones are installed in the ward of Playa, is of 2,220 volts, and the current running through the uncovered wire furnishing movement to the trolley rating from 500 to 550 volts, said wire being strung under the electric wires of the main line furnishing current to those which form the connection of said house No. 28, this court not considering that the distances existing between the uncovered wire of the trolley and those of the main line and between said wire of the trolley and those forming the connection were satisfactorily shown.

"Fourth. The court finds that in front of house No. 28, and a little higher than the two electric wires forming the connection of said house, the wires of the general telephone line pertaining to the South Porto Rico Telephone Company are placed, and a little lower down than the wires of the connection there is a balcony that has not been entirely identified as to what house it belonged, though it seems to belong to house No. 28, said balcony being placed at such distance from the wires composing the connection that a man standing upon the railing thereof would have his head on a higher level than that of said two wires and could examine the covering or insulating matter thereof from its upper part and determine the condition thereof.

"Fifth. The court finds that on said October 10, 1910, and on Royal Street or road of Playa, and opposite to said house No. 28, which is of one story, Ramón Rodríguez Vázquez, who was there stringing a telephone line as an employe of the South Porto Rico Telephone Company, caught a telephone wire which was hanging towards the street, and after rolling the same threw it up over the two electric wires forming the connection of said house, and upon catching it again by the other side of said two wires and pulling thereon with both hands he was violently lifted and thrown upon the balcony of the house adjoining house No. 28, to wit, house No. 26, thereby receiving several serious shocks in his body, he having held the wires in his hands for about five minutes, it thus being very difficult for the persons who tried to help him to separate him from said wire.

"Sixth. The court finds that the telephone wire which Ramón Rodríguez Vázquez had in his hand at the time the accident occurred, and to which the foregoing paragraph refers, was in contact with the

electric wires forming the connection of house No. 28, and that by virtue of said contact an electric current of unknown intensity was transmitted through said wire which was diverted into the body of said Ramón Rodríguez Vázquez, causing him serious wounds, especially in both hands, this resulting in the obstruction of the blood vessels, and thereby causing, though gradually, a general paralysis which produced his death in the following month, to wit, November, 1910.

''Seventh. The court does not deem that it was entirely shown what the minimum degree of intensity of an electric current is necessary to kill a young, strong, robust and healthy person, as it had been shown said Ramón Rodríguez Vázquez was, the court neither thinking that it was satisfactorily shown whether or not said Ramón Rodríguez Vázquez was sweating or not at the moment the accident occurred, or whether or not his body or hands were wet; the court neither thinking that the topographical conditions of the place were the accident occurred were entirely shown; that is, whether such place was completely dry or wet, or at some parts dry and at others wet.

''Eighth. The court considers that it was not shown in any manner that besides the contact of the wires forming the connection of house No. 28 with the telephone wire which Ramón Rodríguez Vázquez was throwing over the others, the wires making the connection had any other contact with any other wire strung in that place and belonging to the defendant company.

''Ninth. The court does not find that the manner in which Ramón Rodríguez Vázquez acted while discharging his duty was the only one of which he necessarily could avail himself to perform his task, nor does it find that upon so doing he took the proper care and diligence to avoid the danger, which is expected from a person of ordinary prudence, and especially of a person having an experience of nearly two years in works of a telephone company, as Ramón Rodríguez Vázquez had, and that he should perform such duties at a place furnishing an apparent danger, as the court considered that was where the accident occurred by reason of the highly dangerous nature of the electric currents.

''Tenth. The court finds that Ramón Rodríguez Vázquez had other means within his reach to perform his task which afforded him entire safety from any danger of whatever nature it might be.

''Eleventh. The court finds that Ramón Rodríguez Vázquez was guilty of contributory negligence, this being the proximate and immediate cause of the burns and injuries which he received on October 10, 1910, in the manner aforesaid, and which caused his death.

"Twelfth. The court does not find any negligent act on the part of the defendant company which was the immediate cause of the accident which occurred to Ramón Rodríguez Vázquez and which produced his death.

"Thirteenth. The court finds that the electric wires of the main line supplying electric current for the purpose of lighting, the two forming the connection of house No. 28, and the uncovered wire furnishing movement to the trolleys or electric cars, all belonging to the defendant company, are placed at enough height over the street level, and in such a manner that no person walking thereon may come in contact with any of said wires; and the court also finds that none of said wires, at the place in which the accident occurred—that is, in front of house No. 28 of Royal Street or road of Playa de Ponce—pass through any cover or roof, they being placed, on the other hand, at a sufficient distance from the houses which are situated on both sides, and in such a manner that no person going upon the roof of said houses could come in contact with any of said wires.

"Fourteenth. The court finds that Ramón Rodríguez Vázquez had the tacit character, in relation to the defendant company, of a mere licensee or person authorized by reason of his capacity or employment in the telephone company to perform works of a certain nature, among which was the stringing of telephone wires, above or under, as the case might be, said wires belonging to the defendant company; and the court also finds that Ramón Rodríguez Vázquez exceeded the limits of his license in not taking the proper care and exercising due diligence while discharging his duties and in using therefor the wires of the defendant company."

The record does not disclose why the widow and the other child of the deceased did not join in this suit or whether they have prosecuted any other claim for damages on the same account. The judgment is based on alleged contributory negligence on the part of Rodríguez, the deceased, and on the lack of proof of the alleged negligence of the defendant company. The appellant attacks the findings of fact, alleging that they are not fairly deducible from the facts shown by the evidence as the same appear in the statement of the case as contained in the record. Then it is well, first, to examine the objections made to the findings of fact and compare them

with the evidence shown by the record.  We will take them up in the order pursued in the record as far as possible.

Reviewing the findings of fact, we may say:

First.  The court, in its third and sixth items, found that the two wires connecting house No. 28 with the main wire from the plant carried an electric current of *unknown* intensity.  This is literally true; but at the same time the testimony of Dr. Córdova shows that it was greater than the usual strength of 110 volts, and in this he is corroborated by Mr. Curtiss, the manager of the defendant company.  The court might well have found the minimum intensity and that the current carried was much greater.

Second.  It was also found in the third paragraph that the wires showed some small peelings that could be perfectly noticed at first sight by any person standing on the street, under the said two wires, by simply looking at them.  It appears from the testimony that it was necessary to look closely in order to see the exposed portions of the wires, and there is testimony that they could not be seen from the street at all.  It is also stated that the peeled parts were of the same color as the other portions of the wire, and that the only difference consisted in the smaller size of the wire in the naked places.  This is shown by the testimony of Quintana, Vázquez, Pedro J. Coll, José V. Coll, and Ramos.

Third.  The trial court, in the fifth paragraph of the findings, states that after throwing the telephone wire over the light wires, "the deceased caught it again on the other side of said two wires and, pulling thereon with both hands, he was violently lifted and thrown upon the balcony," etc.  This finding is unsupported by the evidence, which shows that Rodríguez did not pull on the telephone wire, but received the shock as soon as the wires came in contact.  This is shown by the testimony of Pedro Coll, Quintana, and Ramos.  His connection with these wires was certainly involuntary, and the judge hardly considered it otherwise.

Fourth.  The court also, in the seventh finding, says that

it was not "entirely shown what is the minimum degree of intensity of an electric current necessary to kill a robust young man such as the defendant," this fact being sufficiently shown by the testimony of Dr. Córdova, who testified that more than 110 volts would be necessary. It was not required to prove the exact minimum intensity required even had it been practicable. The physician had already stated that this minimum would vary according to the circumstances attending the contact.

Fifth. The court also, in the seventh finding, states that "it was not satisfactorily shown whether or not the said Rodríguez was sweating at the moment the accident occurred." This is not consistent with the statement of facts. The witness, José Coll, testified "that the hands of the individual were dry; that there was no moisture about him." Ramos said that "in his hands there was no mud nor moisture at all." There is no evidence to the contrary.

Sixth. The court also continues, in the said seventh finding, to say that he did not "think that the topographical conditions of the place where the accident occurred were completely shown—that is to say, whether such place was entirely wet or dry, or at some parts dry and at others wet." There is abundant evidence which clearly shows that the place referred to, where Rodríguez was standing, was entirely dry. See the testimony of the witnesses Quintana, Pedro Coll, José Coll, and Ramos, the latter adding, as a reason for his statement, "that in spite of the fact that he had been rolling on the ground he had not become muddy at all."

Seventh. The trial court also, in the ninth paragraph, found as a fact that it was not shown that the deceased "took proper care and diligence to avoid the danger which is expected from a person of ordinary prudence," etc. The evidence does not sustain this finding, as will be shown later on in this opinion.

Eighth. The tenth finding of fact states that the deceased had other means at hand by which to do his work with entire

safety, although it does not clearly appear from the evidence what such means were or how he could have proceeded.

Ninth. The trial court's eleventh and fourteenth findings in regard to contributory negligence are not justified, as will be seen from facts stated and discussed hereafter.

Tenth. The court, in its twelfth finding, says that it "does not find any negligent act on the part of the defendant company which was the immediate cause of the accident." This is not consistent with the facts proven as we view them, as will be shown when we discuss that question fully later on in other pages of this opinion.

Eleventh. It is unnecessary to examine the findings further on the objections made thereto by the appellant as the foregoing embrace the principal points presented. Of course, the findings of the trial judge must accord with the facts as demonstrated in the statement of the case, or they cannot be held to support the judgment. If the court has drawn improper conclusions from the facts as stated and certified to by him, he has committed a manifest error requiring a reversal of the judgment and the granting of a new trial. *Dyer* v. *Heydenfeldt* (Cal.), 4 Pac. Rep., 1187; *S. C. Ry. Co.* v. *Slauson,* 138 Cal., 343; *Hunter* v. *Milam,* 133 Cal., 603.

Then, although the judgment of the trial court was improperly based on erroneous findings, not justified by the statement of the case approved by the same judge, it is well, in order to make a thorough examination of this record in all its aspects, to review the alleged errors specified in the assignment. We will accordingly take them up in their order, as far as convenient, and discuss them in relation to their results as shown by the decision. They are very numerous, amounting to sixteen regularly assigned, so it is well to present them fully before entering on their consideration.

The specification of errors, as set out in appellant's brief, reads as follows:

"SPECIFICATION OF ERRORS.

"First. The court committed an error in refusing the first motion

of the plaintiff praying for a judgment by virtue of the allegations set forth.

"Second. The court committed an error in refusing the second motion of the plaintiff praying for judgment by virtue of the allegations presented, after having granted the amendment to the affidavit of the answer.

"Third. The court committed an error in not allowing the plaintiff to prove, through the witness, Dr. Ulpiano S. Córdova, the history of the illness and the accident related to said doctor by the injured party when the doctor went to attend him.

"Fourth. The court committed an error in refusing to allow the plaintiff to show, through the witness, Dr. Ulpiano S. Córdova, the minimum voltage required to cause the wounds which said physician noticed on the person of Ramón Rodríguez Vázquez, because said physician had testified that he had studied electro-therapy; that he had examined the injured person, and that he was acquainted with the physiological effects upon a person of an electrical current; that the defendant had admitted his qualifications as a medical expert, electro-therapy being one of the subjects required in the medical profession.

"Fifth. The court committed an error in not permitting the plaintiff to prove, by the testimony of the witness, Dr. Ulpiano S. Córdova, the minimum voltage required to cause the burns which he found on the injured person, and what would be the minimum voltage required, in accordance with medical science, to cause mortal wounds in a person, for the same reason assigned for the preceding exception and because the defendant objected without alleging any reason therefor.

"Sixth. The court committed an error in permitting the defendant to prove, on cross-examination of Dr. Ulpiano S. Córdova, that the electric tension increases when the person's hands are wet, because it had not been previously shown that said person's hands were wet.

"Seventh. The court committed an error in refusing to strike out the four cross-questions put by the defendant to the witness, Dr. Ulpiano S. Córdova, as well as the answers given by him, all of which more specifically appears under No. 7 of the foregoing bill of exceptions, because the same were impertinent and were not properly founded upon facts.

"Eighth. The court committed an error in refusing to allow the question put by the plaintiff to the witness, Francisco Quintana, as to whether the amount of water thrown on the street was so voluminous as to percolate through the surface or only as to wet it, because said

question was pertinent and it was objected to by the defendant without alleging any reasons therefor.

"Ninth. The court committed an error in refusing to permit the question put by the plaintiff to the witness, Francisco Quintana, as to whether he was certain the place where the injured person stood was dry or wet, because said question was pertinent, as is shown by the fact that the court in its findings did not consider this point proven, and the defendant objected to said question without stating any reason therefor.

"Tenth. The court committed an error in not allowing the question put by the plaintiff to the witness, José V. Coll, as to whether said witness had ever given authority to the defendant company to instal those wires, or any electric wires, in house No. 28 on the Playa road, because the object sought by the plaintiff by said questions was to show that the defendant company had kept during seven years an electric connection over that house, with current, in a dangerous place, without any benefit to or authority from the owner, as alleged in paragraph five of the complaint, and therefore that allegation of the complaint, which was an essential averment of the same, remained unproved.

"Eleventh. The court committed an error in refusing to allow the question put by the plaintiff to the witness, José V. Coll, as to whether said installation in said house, during the seven years that the witness lived in it, had been used by him in any way, because said question was material and tended to show, taken in connection with the previous question, that the defendant was a trespasser at the time of the accident, and because the defendant company opposed it without alleging any reasons therefor.

"Twelfth. The court committed an error in refusing to permit the question put by the plaintiff to the witness, José V. Coll, as to whether, during the seven years that the witness inhabited said house, he had paid, or the company had tried to collect, any bill for electric light in said house, because said question was material and had the same object with the two previous questions, the defendant having opposed it without stating the reasons therefor.

"Thirteenth. The court committed an error in granting, at the conclusion of the plaintiff's evidence, the motion for nonsuit made by the defendant to dismiss the complaint on the ground that the evidence had not shown any negligence on the part of the defendant, and that, if any existed, the plaintiff was also guilty of contributory negligence, because from the evidence introduced it clearly appears that the defendant was negligent and that the essential averments of the complaint allowed by the court had been proved, and that there was no

contributory negligence on the part of the deceased, whose death was caused by the negligence of the defendant.

"Fourteenth. The court committed an error in considering, in its decision of the motion for nonsuit, grounds and arguments not specifically alleged by the defendant in its motion.

"Fifteenth. The court committed an error in not holding that in Porto Rico, in cases like the one at bar, when the cause of the accident is proven, the negligence of the defendant is presumed until the defendant shows that it has used all the diligence that a good father of a family would use.

"Sixteenth. The court committed an error in not holding that, when a motion of nonsuit is made, all the evidence introduced by the plaintiff is presumed to be true, as well as any fact or facts which might be legally inferred from the evidence introduced; and the court also committed an error in not weighing the evidence introduced in the manner most adverse to the defendant."

Having thus set out at length and literally the errors complained of by the appellant, we may proceed to a careful examination of them. It is well, from the nature of the subjects covered thereby, to consider the several points in groups to save time and make the matter more clear and easily understood. The sixteen specifications of error may then, for the purpose of this discussion, be thrown into only six groups, as follows:

I. It is alleged that the court erred, as set forth in specifications 1 and 2, in not granting plaintiff's motion for a judgment on the pleadings.

II. The appellant complains that the court fell into error at least five times in ruling on the evidence of the witness, Dr. Ulpiano S. Córdova, as itemized in specifications numbered 3, 4, 5, 6, and 7.

III. Specifications 8 and 9 allege error in refusing to allow questions to be put by the plaintiff to the witness, Francisco Quintana, as to the water on the street and in regard to the condition of the spot where the injury occurred, whether it was wet or dry.

IV. In the examination of the witness, José V. Coll, the

owner of house No. 28 on Playa Street, the appellant complains that at least three errors were committed by the court, as detailed in specifications 10, 11, and 12.

V. The plaintiff claims that when the cause of the accident has been proven, as is alleged to have been done in the case at bar, the defendant is presumed to have been guilty of negligence, until it is further shown by evidence that all the diligence has been used which a good father of a family would employ to avoid the damage. This is set forth in the 15th specification of error, and she relies on the last paragraph of section 1804 of the Civil Code of Porto Rico as establishing a rule of evidence as well as liability.

VI. Finally, the appellant complains that the court committed a fundamental error in sustaining the defendant's motion for nonsuit and rendering judgment against the plaintiff, as set forth more in detail in the 13th, 14th, and 16th specifications of error.

First. The plaintiff asked for judgment on the pleadings because the answer was not supported by affidavit, as required by the statute. Code Civil Procedure, secs. 118-132. One of the objections to the affidavit is that the affiant does not show himself to be authorized to make it. He states that he is the manager and better informed in regard to the facts than any one else. This is sufficient under section 118, which says, at the end thereof, "when a corporation is a party, the verification may be made by any officer thereof." The manager could properly verify the answer.

But a further defect in the affidavit is that the same does not specify, as sworn to, the allegations of the *answer*, but of the *complaint*. On reference to the affidavit this is seen to be the case. But the defendant's counsel confesses this error, which they impute to the typer, and say that they intended to say, in speaking of "the facts set out in *the complaint*," instead thereof "the facts set out in the *answer to the complaint*." They asked leave to amend the affidavit in this particular, which was granted by the court. The court had

the discretionary power to permit such an amendment; and it is well settled that, where such discretion exists, we cannot revise its action in the exercise thereof unless it is shown that such discretion has been abused. *Palace Hardware Co.* v. *Smith,* 134 Cal., 381; *Nicoll* v. *Weldon,* 130 Cal., 666; *Melde* v. *Reynolds,* 129 Cal., 308; *Gould* v. *Stafford,* 101 Cal., 32.

But from all that appears in the record, although the defendant was permitted by the court to make the amendment to the verification, it was never actually made. Record, pp. 10, 18, 19, 20, 21, 80, 81, and 93. This was probably a mere neglect on the part of some undisclosed person, but we must take the record as we find it in the transcript. Still, although on the face of the record the action of the court might appear to be erroneous, whatever error may have been committed was immaterial, since both parties treated the amendment to the affidavit as having been actually made. However, should the cause be remanded, the trial court ought to require the amendment to be formally perfected.

Second. Dr. Ulpiano S. Córdova was called as a witness by the plaintiff. As this group of alleged errors relates altogether to questions testified to by this witness, it is well to set out his testimony in full. He testified as follows:

"The witness, Dr. Ulpiano S. Córdova, being duly sworn, testified: That his name is Ulpiano S. Córdova y Dávila; that he is a physician and surgeon; that after being graduated he has practiced his profession eight years and before he had had 12 years of medical practice; that he had occasion to know Ramón Rodríguez Vázquez; that he met him about the month of October of last year, when he was called to treat him for the first time, but he knew him by sight before, but never had treated him; that the day he was called to treat him he examined him carefully; that he showed burns of the third class upon his forehead, nose, face, thorax, left arm and one of his legs, but does not remember whether the left or the right one; that said burns were deep ones, of the third class, causing the loss of the muscular tissues; that having examined the stomach and the intestines of the said person they showed the crepitation of the 'cualido,' and there were some awful burns from the buccal to the intestinal vis-

cera; the heart did not work well; the kidneys were in bad condition; the 'vaso' was also in the same condition; everything was in bad condition. That 10 or 12 days thereafter he was told that said person had died; that by reason of the examination that he made, by the nature of the wounds and by the condition in which his interior organs were, he may state that said wounds must have been caused by an immense force, such as an electric shock or by electricity; that it must have been by electricity; that in his opinion said wounds were produced by an intense caloric force such as electricity; that another caloric force different from electricity cannot produce such intense wounds nor those of that character; that he looked into the stomach to see if there were zigzags, but he found none, but there were some on the forehead; that the condition of the wounds of his hands was difficult to ascertain because of the diverse lines that the hands have; that the odor was of a putrid nature. That one of the courses of the medical profession is electro-therapy, or the effects of electricity upon man. That he knew that person before but never had prescribed for him; that the individual was a fat, robust person, and although he never examined him, he had the appearance of a healthy man; that assuming that said person was 22 years old, strong, robust, healthy, sober, laborious, of a vigorous constitution, in good health, not having suffered any disease of his internal organs, he is of the opinion that an electric current of 110 volts would not have been sufficient to burn him in the manner in which he was burned; that an electric voltage, from a medical point of view, is the degree of intensity of the current, the tension of the current; that he does not know how the volume of electricity is called; that he knows the word 'voltage' in medicine; that the amount of voltage necessary to kill a person is studied in medicine; that he had occasion to study everything in connection with the application of electricity to persons, which may be called the dosing of electricity required for certain special diseases; that a doctor must also study the effects of voltage in connection with a person according to the different classes of diseases and also the amount of electricity necessary to kill a person; that voltage is the intensity of the current; that through the apparatus employed for that purpose he could ascertain the intensity of a current; that the amount must refer to a unit—that is, the voltage. 'What force is developed by the voltage? Answer—'My knowledge does not go so far.' '' (The last four answers of the witness were given in reply to questions of the court.) ''That Ramón Rodríguez Vázquez, assuming that he was 22 years old, a robust, healthy, sober, industrious person, weighed 145 pounds, more or less, who never had suffered any disease, with his internal

organs in working order, a normal man, standing in the street, on the side of the street next to the sidewalk, on dry soil, holding a telephone wire that was being laid and which. wire comes in contact with other electric wires, and assuming that through said electric wires electricity runs of a tension or voltage of 110 volts, and assuming that that wire, conducting 110 volts, comes into contact with said individual of the conditions above mentioned, and that the same has held in his hand the telephone wire, and on being connected with the electric wires he should receive a shock that would throw him to the ground, holding said wire for five minutes, more or less, without being able to throw it off, and while holding said wire should receive constant electric shocks, in the opinion of the witness, said voltage of the current running through said electric wires at that moment connected with said person being of 110 volts, the same would not have been sufficient to cause the mortal wounds that the said person, Rodríguez Vázquez, showed on his body, as he has testified. That a person of the conditions above described could live from 60 to 70 years in Porto Rico.''

Upon cross-examination he stated: ''That all persons do not have the same strength to stand electricity; it may be said that every person has a different constitution and is able to stand more or less electricity; that the electric current necessary to kill one man may perhaps not have any effect at all on a different individual; but there is a certain minimum voltage that does not kill anybody; that is to say, that a voltage of 145 may kill one person and not kill another, but the minimum voltage of 110 does not kill anybody. 'Is the effect of 110 volts the same on a person with wet hands as on another with dry hands?' Answer—'In a person with wet hands the tension increases a little; science does not fix how much it would increase; it is known that the tension increases a little, but the amount is not known.' That the effect of an electric current is different according to the point where the current connects; for example, a current applied upon the solar plexus would undoubtedly kill a man sooner than if the same was applied to his hands; there is a difference in the effects of the shocks in relation to the point where the current is applied.''

The first question that arises in regard to the testimony of Dr. Córdova is whether or not he should have been permitted to answer the plaintiff's question and recite to the court the statement made to him by Rodríguez, his patient, as to the circumstances of the incident and how he came to

be burned. It must be borne in mind that the witness, so far as the record shows, only had one interview with his patient and this was in the month of October, 1910; that the injury occurred on the 10th day of that month and Rodríguez died on the 14th of November following. It must have been near the end of October that the doctor saw his patient, for he says that 10 or 12 days afterwards they told him that the man was dead. The account given by the injured man was narrated to his physician too long after the incident for the statements to be regarded as a part of the *res gestae.* They were merely hearsay and were properly excluded from the evidence in the case. 16 Cyc., 1246 and 1192 and cases cited.

The court also refused to allow Dr. Córdova to testify, as an expert, as to what was the minimum voltage which is necessary to produce the wounds which the physician had observed in his patient, and to produce mortal burns in an individual. This refusal was based on the ground that the court did not consider that Dr. Córdova had shown himself to be qualified as an expert. His testimony shows that he had some qualifications as such, though perhaps he was not as familiar with the power of electrical currents as some experts profess to be. It would have been safer to admit his testimony for what it was worth and to properly weigh it when making up the findings of fact. But the admission made by the defendant when the plaintiff was examining the doctor to qualify him as an expert was sufficient to prevent any objection to his testimony as such. The record recites that the defendant admits that the witness possesses the knowledge and necessary requisites in order to testify as an expert physician in this case. Then he was certainly qualified to say what was the minimum voltage which could have produced such wounds as those observed on the injured man and which would have produced mortal burns. This is a matter which is in this, the second decade of the twentieth century, within the professional knowledge of an ordinary

general practitioner in the modern science of medicine. To exclude it was clearly an error, especially when viewed in the light of the findings made by the court on which the judgment was based.

But by this same professional witness the court permitted the defendant, on cross-examination, to prove that the force of the electrical current would be slightly increased when applied to a person through his hands when they were wet, although there was no proof that the hands of Rodríguez were wet on that occasion. If it might be surmised that they were damp from perspiration it can be shown by the findings of the court that this fact was not established by the evidence. Hypothetical questions, in order to be admissible, must be based on facts already proven in the case. This not having been done, the admission of this testimony was error. This principle is so well known that it is scarcely necessary to cite authorities.

Then should the court have sustained the motion of the plaintiff to strike from the record the four replies made by the witness, Dr. Córdova, to the four questions put to him on cross-examination, conducted by defendant's counsel. They were the following:

First.—Q. "Would you be able to state what would be the increase of the tension?" Second.—Q. "What is the arithmetical rule?" He replied: "It is not described by science; we know that the tension increases a little, but we do not know how much." Third.—Q. "Do you think, doctor, that the effect of an electric current, admitting that it is of 110 volts, is always the same whatever may be the manner in which the shock is received, and whatever may be the manner in which the wire is held?" He replied: "It is a different thing; that depends on the point upon which the current strikes; for instance, an electric current applied upon the solar plexus certainly would kill a person sooner than if the same was applied to his hands." Fourth.—Q. "So that there is a difference, according to your statement, in the

effects produced by the shock?" He replied: "Yes; according to the place where the current is applied."

Inasmuch as the witness was admitted by the plaintiff to be an expert, and was even offered as such, she cannot now claim that these replies were not admissible for want of his qualifications. But they are objected to as being impertinent and for want of the necessary foundation in fact. We do not so regard them. They tended to prove or disprove the issues made in the pleadings and were properly admitted, and it would have been an error on the part of the court to strike them out.

Third. The witness, Quintana, was asked by the plaintiff two questions tending to show the humidity or aridity of the street and the particular spot where Rodríguez was standing when he was burned by the electrical current. These interrogatories were ruled out by the trial court. It is difficult to understand how this evidence could have been regarded as irrelevant or impertinent, especially when, by a reference to the findings, it appears that the court found as a material matter that this fact was not proven. There was no objection to these questions made by the defendant which would throw any light on the matter. As it is well known, and appears from the evidence in the record, that humidity increases the force of the electric current, it was certainly pertinent to the issues in this case to show the state of the ground in and around the spot where the deceased was standing when he received his death wounds. The exclusion of this testimony was a manifest and material error.

Fourth. The appellant claims that certain evidence of the witness Coll should not have been excluded, since it would have tended to establish a material allegation of the complaint. The fifth allegation of the complaint reads in these words:

"Fifth. That according to the information obtained by the plaintiff the owner of said house No. 28, on the road of Playa de Ponce, never consented to the establishment of said connection, which was

formed by said two electric wires, and from the time that he has been living in his said house, since some years ago, he has never made any use of the electric light of the defendant, and, notwithstanding this fact, the latter has negligently consented that said two wires remain therein as they were on October 10, 1910, and connected with the aforesaid house and under said telephone wires.''

The plaintiff sought to show by this evidence that the defendant company had maintained, during seven years prior to the death of Rodríguez, an electric connection with house No. 28 by means of the wires carrying the current that killed the deceased, in a dangerous, public place, without benefit to the owner of the house and without his permission, and that thus defendant was a trespasser, and that this testimony was material and in support of the fifth allegation made in his complaint. It may be remarked that no exception was taken by the defendant to this paragraph of the complaint and no motion was made to strike it from the record, and that it was one of the issues on which the case was tried. Certainly the negligence of the defendant was an important issue, in fact, the main issue, in this case. And if the defendant kept in place, for seven years, a pair of idle wires, bearing a deadly current, running to a house whose owner did not authorize nor desire the connection, this would be a circumstance at least tending to show negligence on the part of the defendant, as is alleged in the complaint. Then the testimony of the witness Coll on this point was pertinent and material and should not have been excluded.

Fifth. The fifteenth specification of error presents a question of law purely, since the cause of the death of Rodríguez was indisputably established to be the electric current running through defendant's wires. The section of the statute relied on by the appellant is the last clause of 1804 (Civil Code, p. 1164), and reads as follows:

''The liability referred to in this section shall cease when the persons mentioned therein prove that they employed all the diligence of

a good father of a family to avoid the damage.'' See Civil Code, section 1804, last paragraph.

The much-respected commentator, Manresa, in regard to the corresponding article of the Spanish Civil Code, makes the observations following:

''That said liability ceases when the persons who are held liable according to section 1803 show that they used all the diligence of a good father of a family, and, therefore, a legal presumption is required by said section in regard to the liability of the persons referred to in said section, inasmuch as such is due to the relations, of authority or superiority, which they hold with the persons causing the injury. It is presumed by the law that the cause of said injury is charged upon them on account of their own fault or negligence and they are considered as the moral authors of said injury, in view of the fact that they did not take the care or superintendence necessary to prevent the causing of said injury resulting from the aforesaid fault or negligence; and this is also the view taken of the matter in the judgment of May 18, 1904, above cited, but said presumption which has been established by law is not an absolute one or *juris et de jure*, but *juris tantum*, and therefore is dissipated by adverse proof.'' 12 Manresa 611.

This is an attempt on the part of the appellant to apply to this case the doctrine of *res ipsa loquitur*, which is explained very clearly, in an opinion of Mr. Justice Vandevanter in the case of *S. J. L. & T. Co.* v. *Belén Requena*, decided on the 18th of March last. That part of the opinion reads as follows:

''In its charge to the jury the court explained, in substance, that a company supplying electricity for lighting purposes and engaging with individuals to deliver a suitable current at their residences and places of business over its own system of wires and appliances is bound to exercise such control over the subtle and perilous agency with which it is dealing, and to take such precautions in the maintenance and inspection of its wires and appliances as are reasonably essential to prevent an excessive and dangerous current from passing from its supply wires to the service wires of its patrons, and then said:

'' 'And you are further instructed that if you believe from a pre-

ponderance of the evidence that the deceased came to his death while innocently, and without knowledge of any danger, using an incandescent light, the current for which was furnished, or to which the electricity was supplied, by the defendant company, the presumption is that the electric company was negligent, and it devolves upon it to show that the surplus and dangerous current that came over the wires did not occur from any negligent act on its part.'

"Exception to this instruction was taken upon the ground that it erroneously applied the doctrine of *res ipsa loquitur*. While recognizing that that doctrine is of restricted scope, and when misapplied is calculated to operate prejudicially, we think there was no error in its application in this instance. The deceased was without fault. The defendant's primary wire was carrying a current of high and deadly voltage. Its secondary wire conveyed to his residence an excessive and dangerous current which could only have come from its primary wire. Had its wires and converters been in proper condition, the excessive and dangerous current would not have been communicated to its secondary wire and the injury would not have occurred. These wires and converters were exclusively under its control, and it was charged with the continuing duty of taking reasonable precautions, proportioned to the danger to be apprehended, to maintain them in proper condition. In the ordinary or usual course of things, the injury would not have occurred had that duty been performed. Not only did the injury occur, but immediately thereafter both converters were found to be out of order; one being heated and its insulation charred, and the protecting ground wire of the other being broken or severed. Besides, the defendant engaged to supply a current of low voltage, reasonably safe and suitable for lighting, while the current delivered on this occasion was of high voltage, extremely dangerous and unsuitable for lighting purposes. These circumstances pointed so persuasively to negligence on its part that it was not too much to call upon it for an explanation. Of course, if the cause of the injury was one which it could not have foreseen and guarded against, it was not culpable, but in the absence of that or some other explanation there was enough to justify the jury in finding it culpable. This was all that was meant by the instruction, reasonably interpreted. It was not a model, and, if it stood alone, might be subject to criticism. But if read in the light of what preceded and followed it, and of the case before the jury, it was unobjectionable. When so read it rightly declared and applied the doctrine of *res ipsa loquitur*, which is, when a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the

injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care." *Inland and Seaboard Coasting Co.* v. *Tolson,* 139 U. S., 551, 554; *Oil Co.* v. *Torpedo Co.,* 190 Pa., 350; *Alexander* v. *Nanticoke Light Co.,* 209 Pa., 571; *Trenton Passenger Railway Co.* v. *Cooper,* 60 N. J. L., 219; *Newark Electric Co.* v. *Ruddy,* 62 N. J. L., 505; 2 Cooley on Torts, 3d ed., 1424; 4 Wigmore on Evidence, see 2509.

We believe this doctrine applicable to the present case and the trial court erred in not making the application. This failure of the trial court to give effect to the proper principles of law governing this case was a fatal error, and would alone require the reversal of the judgment.

Sixth. Finally, we arrive at the fundamental question: Did the trial court properly sustain the defendant's motion for a nonsuit on the termination of the plaintiff's evidence? Several reasons are urged by the appellant to show that said motion ought not to have been granted. We will not observe the exact order in which they are presented.

It is contended that on a motion for nonsuit all the evidence adduced by the plaintiff should be taken as true, and any facts which might be legally inferred from such testimony should be conceded. This, it is claimed, was not done by the court in the present case. Sustaining a motion for a nonsuit is like rendering judgment on a demurrer, it being in reality a demurrer to the evidence. Motions for nonsuit should be considered with great caution and only granted in the clearest cases. But there is nothing in the record to inform us that all the evidence introduced by the plaintiff was not taken by the court as true, though it may be the fact, and doubtless is, that different inferences were drawn from it than those deduced by plaintiff's counsel. It was not incumbent on the court to give to the plaintiff's evidence the greatest possible weight; but it must be estimated fairly to both sides, as should be done in all cases, and at all stages of the proceedings.

But should the court have considered in passing upon the motion for nonsuit grounds not therein alleged? It is unnecessary to determine whether this was done or not, since the court, had the condition of the pleadings and the proof justified it, could have made the order nonsuiting the plaintiff, of its own motion, regardless of any action taken by the defendant in the matter, so there was no error in this respect.

But did the evidence show that the defendant was free from all negligence or fail to show that it was guilty of any negligence whatever? Certainly not. It was clearly proven that the defendant suffered an electric current to run from its main line of wires to house No 28, where it was not used, and over connections that had been idle for at least seven years. And these connecting wires were naked in places, affording opportunities for this current to escape and injure any person who might, by any chance, come in contact therewith. These negligent acts on the part of the defendant are, for the sake of argument, conceded, but it is contended that they would have been harmless had not the carelessness of the defunct set them in motion.

We cannot admit the soundness of this train of reasoning. It is inconsistent with the principles of law announced in the latest and most approved authorities, such as the Tolson case and others therein cited, which are commented on and quoted later on in these pages.

Moreover, as decided in a case arising in Louisiana, it is the absolute duty of an electric light company, conveying electricity by overhead wires, strung through the streets of a city, to keep its wires constantly insulated, so as to be prepared to guard against the effect of objects coming in contact with them regardless of the facts and causes which may bring about the contact. *Hebert* v. *Lake Charles Ice, Light & Waterworks Co.*, 11 La., 522; citing *Fitzgerald* v. *Edison E. I. Co.*, 200 Pa. St., 540; 50 Atl. Rep., 161; 86 Am. St. Rep., 732; and other cases. See also *McLaughlin* v. *L. E. L. Co.*,

34 L. R. A., 812; and *Haynes* v. *Raleigh Gas Co.,* 26 L. R. A., 813.

But it is urged that the unfortunate Rodríguez, whose child seeks redress in this case, was guilty of contributory carelessness, which was the proximate or immediate cause of his horrible injuries and untimely death. And the trial court announces, as the doctrine on which this case should be decided, the following:

"From the current of authorities is inferred the unquestioned principle that if the negligence of the defendant is of a passive character and affords only the means or condition which, under given circumstances, may cause an injury, and said circumstances are put in operation and produce, by the will and independent act of the plaintiff, a result in such an efficient manner that without such act the injury would not have been caused, said independent act on the part of the plaintiff is the proximate cause of the accident; excepting in the case, which is not the one at bar, where the defendant, notwithstanding the fact of the existence of negligence on the part of the plaintiff, might have prevented him from being injured and did not do so."

But this court seems formerly to have taken a different view of the law applicable to such cases. In a well-considered opinion, as late as January 15, 1909, the court uses the following language:

"There are many cases which decide that although a complainant might, by the exercise of caution, have avoided the accident, yet he may, nevertheless, recover, if it be shown that the defendant might have avoided the accident by exercise of proper care. *Grand Trunk Ry. Co.* v. *Ives,* 144 U. S., 408; *Inland & Seaboard Coasting Co.* v. *Tolson,* 139 U. S., 551; *Davies* v. *Mann,* 10 Meeson & Welsby, 546-549; 19 English Ruling Cases, 190. The courts have held that in crossing over electric wires, which are supposed to be insulated, if a workman does not take the safest way, yet he has a right to rely on the owner doing his duty, and, if he takes the most convenient way, he is not guilty of contributory negligence." *Clements et al.* v. *Louisiana Electric Light Co.,* 16 L. R. A., 43; *Perham* v. *Portland General Electric Co.,* 40 L. R. A., 799; *Vargas* v. *A. Monroig & Sons,* 15 P. R. R. 30.

Then let us see what Rodríguez did in connection with the train of incidents which resulted in the injuries costing him his life. His own statement of the case is not in the record; his lips are sealed in the silence which, for us, at least, will never be broken. But we may glean some information from the testimony of the witnesses, which is to be found in the transcript.

Francisco Quintana testified as follows:

"That he was upon the fence situated at the house of Mayol and in front of said house. There was a telephone wire placed upon the front, and very near to the same there were some electric wires which connected the house No. 28; that while he was standing on the porch he saw a man grasping the telephone wire, who was throwing the same upon the electric wires, and at the moment that he caught it on the other side, jumped up with the wire in his hands, from which he could not get free; that we went toward him and made an effort to separate him from the wire, which we could not do; that while he was doing that, José Coll arrived and gave him some bicycle tires; that he tied the man to said tires, thus being able to separate him; that several other persons arrived and some of them held him by the arms, and the witness pulled his tongue out to prevent him from being choked, until the arrival of the trolley, and then they carried him to the town. That what he did was to throw the telephone wire over the connection of the electric wire; that said connections connected the house No. 28; that there were two wires; that when the accident occurred Ramón Rodríguez Vázquez was standing at the edge of the sidewalk, from which place he started, taking a direction towards the left hand; that when he was separated by such shock he was standing on the ground, as there was no sidewalk in that place; that the sidewalk was made afterwards; that at the moment there was only earth there; that it was wet in the middle of the street, as the same had been sprinkled, but the place where he was standing was dry and the water did not reach that place; that where he was standing it was not wet, but it was dusty; that he was able to separate him from the wire by using the bicycle tires; that while he was trying to separate him from the wire the person was moving very much and some smoke was coming from his mouth; that he was complaining greatly and some movements and shocks could be observed; that he tied him by his neck with said tires until he pulled him out; that the electricity could not pass through the tires; that he could hold him by his feet, but was

afraid as the electric current could communicate to him, and therefore left him loose; that immediately after the accident had occurred he had a chance of seeing under the electric wires that part belonging to the same which remained underneath; that he could not find that there was any uncovering or peeling from the electric wires; that they observed the position of the electric wires; that at some places they appeared thinner and at other places thicker, but it was not possible to determine the place where the wire was uncovered; that what he saw was some peelings in the wires; that said peelings were small; that the wire which Ramón Rodríguez Vázquez was holding seemed to have some other peelings; that immediately after the occurrence he noticed that the telephone wire was placed upon one of these peelings; that he observed that immediately after the accident; that in order to observe said peelings one had to look at the same carefully; that said peelings were in the part corresponding to the inferior side which is high enough; that he could look at the other covers of the electric wires which were stretched running from the trolley line to that house and that some of them seemed to be without cover at some places; that in the place where the accident occurred some peelings appeared in some places of the size of an inch; that said part is the one that is under the telephone wires; that between the said electric wire and those of the telephone there are no wires to prevent them from being connected or crossed; that after the accident he continued working near to that place; that they worked there at times, and some times they worked continually for 15 or 20 days when there was lumber; that he did not look at the wires previously; that he knows some of the employes of the trolley and of the electric plant by sight; that one of those employes some days afterwards covered the wires which are in the place where the accident occurred; that he had seen the thicker wire; that he saw said wires afterwards with the thicker covering; that he does not remember how many days after the accident had passed when he saw this new covering; that he knows that the material which had been put on it had filled it too much; the wire is thicker and for that reason he noticed it; that said person could not be separated from the wire; that the witness saw him and was there all the time until he was taken away; that he saw the wounds he received; that he saw some of them; that some smoke was coming from his mouth and from all his body; that he had a kind of smell as if he was burning. Upon being cross-examined by the defendant he stated that he saw that man when he was throwing up the telephone wire; that he was holding said telephone wire; that the telephone wire was toward this side; he threw it up over the

other, and upon catching it he was stuck to the same; that he was fastened to the same and the wire laid on the ground afterwards when he was throwing it over; that he rolled up said wire and threw it upon the other; that he passed it over the wire of the electric light and then caught it; that he was making a joint in said wire; that he may have tried to stretch it before but that could not be done without an apparatus; that it is not necessary to use the hands in order to stretch the same; that he had seen said telephone wire which was broken there; that he cannot state how long the same was broken, but probably it was in such condition for more than a week; that he does not think that it was so for a month; that said person had his hands uncovered when he caught the wire; that in order to stretch said wire he did not use any cord; that he held the telephone wire in his hands, which were uncovered entirely; that when he pulled on the wire he was standing on the street, on the ground; that he was also on the ground when he caught the wire; that there was no sidewalk there; that witness got near to him as he was thrown down and then caught him; that he was near the sidewalk and had seen the water wagon a few moments before; that there was no ditch there; that the telephone wire was thrown over the fence of Mayol; that the telephone wire was hanging upon the wire of the electric light before the accident and did not touch the same; that he did not notice the wire of the electric light before the accident, but he did notice it thereafter; that it was necessary to look at it carefully at the time of the accident in order to see that the wire of the electric light showed some peelings, which could be noticed from the road; that the same was at some places thinner and at others thicker. In reply to new questions of the plaintiff he stated: That said man was stuck to the wire and unable to separate himself from it for about five minutes, more or less; that when he stated to the opposite party 'that upon catching the wire by the other side the man was injured,' he meant to say that he threw the wire over the two electric connections; that upon holding it, when he fell over to the other side, was when the accident occurred; that the witness was in a place from which he could see him perfectly well; that he tried to make a joint in said wire with another which was ahead of him and higher on the next post; that in order to join the same he had to pass them over said connections, as the telephone wires are always placed over the others; that said street had a kind of a hill; that the portion of the road of the Playa around that place is uneven; that the place where the man was lying was in a dry condition; that upon the place where the witness was standing, looking through the upper part of the wire, it could be noticed that the same was thinner;

that the wire could not be observed as uncovered for the reason that it has the same color and it appears the same, uncovered and with its cover; that it would have been necessary to use a ladder in order to touch the same; that it was only by the upper part. Replying to questions put by the court witness stated: That when he threw up the wire he did that over the electric wires which were running through that place; that there, in the upper part, there was no post with crosses.''

## Julio Castillo testified as follows:

''That one of the telephone wires was laid over the wire of the electric plant and over the wires running from the main line and giving light to the house; that he does not know whether they furnish any light to the house or not; that the place of the electric wires where the telephone wire was resting was thinner and seemed not to have any peeling; that it was in such condition in different parts; that the wire was in the same fix in other places; that a covering has been put in that place which did not have any on the day of the accident; that in order to see the peeling in the electric wires which were hanging upon the house, one had to look at it with a little care inasmuch as the wire is all of the same color; that the wire thus uncovered could be noticed because the same is thinner in some places than at others; that that was what the witness noticed in the lower part of the wire; that he looked at it in order to see whether the same showed peelings on the other side which he could not see in the upper part; that the wire making the electric connection was toward the house; that he looked at it from the ground; that the wire was over his head; that the place which he could see from the ground was the lower part; that the telephone wire was lying about; that he saw a lack of covering on the lower part, but he cannot state whether the same had said covering or not on the upper part, as the witness was below the same.''

Tomás Vázquez, in reply to questions put by the defendant, testified as follows:

''That he did not notice whether the wire was uncovered; that in order to see whether the same was uncovered he had to get upon a balcony; that he tried to look at it from the ground, which he did without effect; that the part which appeared without any cover was about two or three inches, more or less; that the uncovered part of the wire could be seen from below and it seemed thinner than the rest of

the wire, which could be seen by simply looking at it carefully; that he saw that after the accident; that he had no occasion to see said place before the accident.''

Pedro J. Coll testified as follows:

''That he only threw upon one of the electric wires; that upon holding the telephone wire by the other side, after having thrown the same over those of the electric light, then it was that he was thrown upon the balcony; that he was thrown upon the next house to that where the electric connection was; that the place where the man was standing was dry; that in the middle of the street there was some humidity, as some water had been sprinkled by the water wagon; that in the place where the man was no water had been sprinkled, because that is a level place; that at that time there was no sidewalk, but that there is today; that the place where he was is the one occupied now by the sidewalk; that probably he was stuck to that telephone wire about five minutes, more or less, and he tried to separate himself from it, which he could not do, inasmuch as the shock was a very strong one and the wire was stuck to his hands; that he could observe that when he had the wire held in such a manner he received some shocks from the current; that as soon as he caught the wire which he had thrown upon those of the electric light, he was thrown over; that the shock was of such a kind that raised him from the ground and threw him against a balcony; that that happened as soon as the man grasped the telephone wire while the same was falling over those of the electric light; that as soon as he approached said man he noticed a kind of smell similar to that of burning meat; that he did not observe whether any smoke was coming out of his mouth; that immediately after the accident had taken place he had an opportunity of seeing the wire of the electric light because the wire remained on the front and some danger might have been presented; he looked at the two wires and then noticed that the wires had lost something and showed some peelings; that he could notice from the post to the house that the wire showed some peeling at various places; that he looked at the nearest place where the telephone wire was and there observed some peelings. Upon being questioned whether or not he could observe the uncovered wire, or if the same could not be seen, he replied: 'The wire and its cover had the same color and could not be distinguished, but it was noticed that at some places it is thicker and in others thinner; that said peeling in the electric wire probably was about an inch; that at that moment and below the two electric wires

which were laid on the ground none of the pieces of the substance covering the wires were found.' Cross-examined by the defendant he stated: That he knows that Rodríguez had a wire wrapped in his hand; that he cannot assert if it was with the two hands, but he knows that he had the same wrapped in his hands; that he threw up the telephone wire upon the wires of the electric light; that when he fell down to the ground he pulled on the wire, but he did not pull strongly; that he did not try to stretch the same, and the witness has seen that some apparatus is used to stretch the same; that he pulled from the wire but was not stretching the same; that he had nothing in his hands; that the pulling of the wire and the cause of the shocks which threw him upon the balcony happened at one time; that he was pulling with both hands; that he was wrapping the wire with one hand and then had to pull with the other. Replying to new questions put by the plaintiff, he stated: That when he said that said person pulled on the telephone wire he meant to say that he threw the telephone wire over those forming the connection, and when the same reached the ground he pulled from it and then it was that the accident occurred; that said two wires belonging to the connection were loose like a hammock; that the trolley wire is over the electric wires at the very place from which they begin in the general line of the plant; that said trolley wires having current were about half a yard apart; that said trolley wire did not have any cover. Upon being cross-examined again by the defendant, he stated: That the uncovered wire of the trolley is about half a yard under the other wire; that he did not pay any attention to the distance which exists from the trolley wire to the place of the connection, and both wires received the current from the general line, which is parallel with that of the trolley; that he had not noticed the distance between them; that he noticed from the telephone wire that there must be a distance of about two yards from one wire to the other.''

José V. Coll testified as follows:

''That the witness did not see when he was throwing the wire, as he arrived afterwards; that said electric wires which connected his house had some peelings; that they were not entirely covered; that in order to see that, it was necessary to look at them; that while he looked at them he noticed that the covering was lacking and that one part was thinner than the other; that the uncovered wire having a current under which the trolley runs was about 1¾ yards from the electric wire running to his house; that the electric wires were some-

·what used; that in the same condition in which he saw said electric wires he had seen them all that time; that during seven years he had lived in said house, and has never moved from the same, and that said accident occurred at about 1 o'clock. Cross-examined by the defendant, he stated that when he saw Rodríguez he was lying on the ground and the wires were under him; that said wires were under his body; that said defects in the wires of the electric light were many and yet they have the same; that they were of considerable size and that said defects can be noticed from below and from the street very well; that at the time of the accident said defects were in the same condition as now; that on the side of the house they are as visible as in the middle; that the middle part is higher; that witness' house is low and cannot appear on the same line. Replying to new questions put by the plaintiff, he stated: That when he said that the peelings could be seen from the ground he meant to say that some inequalities were noticed, but that they could not be seen from the ground because it is of the same color; that he observed said inequalities from the upper part in different places."

Javier Ramos testified as follows:

"That they saw the electric wires from below and that said wires did not have any defects; that there should be some in the upper part, because on the part below it did not have any defects; that he is not in a position to state what was observed from the upper part because in order to do that he would have been compelled to go up to look at it; that he really observed that there are some parts where the wire is thinner than in others; that it could not be noticed from below whether the electric wire had any defects, and that he does not remember if the street had been watered in the middle, but he was sure that the place where that man was standing was dry."

From the foregoing testimony it appears to be disputed whether or not the exposure of the lighting wires could have been seen from the ground where Rodríguez was standing, the evidence preponderating in the negative. But there is no evidence whatever tending to show that he, or any reasonable man, could surmise that these wires carried a deadly current, as, being used for lighting, they should not have carried more than 110 volts, which is entirely harmless. And there is no evidence in the record that he was an expert

electrician.  In fact, it appears that he was only a lineman of the telephone company, earning $1 a day, and had been thus engaged for two years.  It may be that he did not employ the safest means of stringing the wires.  It is easy to look back after any accident and see half a dozen ways in which it might have been avoided.  As David Crockett said: "If our foresights were as good as our hindsights we would never miss the mark."  Yet the lineman had a right to rely on the electric light company having done its duty, and could not be expected to know that a deadly current had been left exposed running over a wire connection that ought to have carried only about 110 volts.  Certainly the defendant in this case might have avoided the injury and death of Rodríguez by the exercise of proper care, or anything approximating it.  Then, under all the circumstances shown by the facts proven, we cannot hold the deceased guilty of contributory negligence.  And in support of this view we may refer to and quote from some authorities which are entitled to our respect and which we are justified in following.  We will first refer to a decision of our own, made not very long ago, in which we use the words following:

"The usual, or convenient, or ordinary way of doing a thing, where the complainant has no reason to apprehend danger, would exculpate him from the imputation of contributory negligence, if he goes about his business in the usual way.  The engineer, the evidence shows, was the agent and employe of the defendant, and by authority of sections 1803 and 1804 of the Civil Code the appellees are responsible for his action."  (Vargas v. Monroig, 15 P. R. R., 31.)

The Supreme Court of the United States has also adopted the more modern and reasonable doctrine governing the question of contributory carelessness.  In a well-considered opinion the doctrine is stated thus:

"Without going into a discussion of these definitions, or even attempting to collate them, it will be sufficient for present purposes to say that the generally accepted and most reasonable rule of law appli-

cable to actions in which the defense is contributory negligence may be thus stated: Although the defendant's negligence may have been the primary cause of the injury complained of, yet an action for such injury cannot be maintained if the proximate and immediate cause of the injury can be traced to the want of ordinary care and caution in the person injured, *subject to this qualification, which has grown up in recent years* (having been first enunciated in *Davies* v. *Mann*, 10 M. & W., 546), that the contributory negligence of the party injured will not defeat the action if it be shown that the defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of the injured party's negligence. (*Inland & Seaboard Coasting Co.* v. *Tolson*, 139 U. S., 551, 558, and cases cited; to wit, *Donohue* v. *St. Louis, etc., Railroad*, 91 Missouri, 357; *Vicksburg, etc., Railroad* v. *Patton*, 31 Miss., 156; *Dean* v. *Wilmington, etc., Railroad*, 107 N. C., 686; 2 Thompson on Negligence, 1157; Cooley on Torts [1st ed.], 675; 4 Am. & Eng. Enc. Law, Tit. 'Contributory Negligence,' 30; and authorities cited in note 1.)   *  *  *   In determining whether the deceased was guilty of contributory negligence the jury were bound to consider all the facts and circumstances bearing upon that question, and not select one particular prominent fact or circumstance as controlling the case to the exclusion of all the others.'' (*Cooper* v. *Lake Shore & Mich. Southern Railway Co.*, *supra; Baltimore, etc., Railroad* v. *Kane*, 69 Maryland, 11; *G. T. Ry. Co.* v. *Ives*, 144 U. S., 429, 430, 433.)

In the Tolson case referred to, the same high court says:

''The other instruction was in these words: There is another qualification of this rule of negligence which it is proper I should mention. Although the rule is that, even if the defendant be shown to have been guilty of negligence, the plaintiff cannot recover if he himself be shown to have been guilty of contributory negligence which may have had something to do in causing the accident; yet the contributory negligence on his part would not exonerate the defendant, and disentitle the plaintiff from recovering, if it be shown that the defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of the plaintiff's negligence.

''The qualification of the general rule, as thus stated, is supported by decisions of high authority, and was applicable to the case on trial. (*Radley* v. *London & Northwestern Ry.*, 1 App. Cas., 754; *Scott* v. *Dublin & Wicklow Ry.*, 11 Irish Com. Law, 377; *Austin* v. *New Jersey Steamboat Co.*, 43 N. Y., 75, 82; *Lucas* v. *Taunton & New Bedford·*

*Railroad,* 6 Gray, 64, 72; *Northern Central Railway* v. *Price,* 29 Maryland, 420. See also *Williamson* v. *Barrett,* 13 How., 101, 109.)

"Upon careful consideration of all the instructions given to the jury, we are of the opinion that they were applicable to the evidence introduced; that they fully covered the instructions requested; and that they contained nothing of which the defendant has a right to complain." (*I. & S. Co.* v. *Tolson,* 139 U. S., 558 and 559.)

It is further announced in another clear and well-considered opinion that:

"It was the duty of the company, independent of any statutory regulation, to see that its lines were safe for those who by their occupations were brought in close proximity to them. In this respect, and in this particular case, we are of the opinion that the defendant's negligence caused the death of Clements.

"The deceased, Clements, was lawfully on the gallery roof. He was engaged in a service that necessarily required him to run the risk of coming into contact with defendant's wires, either by stepping over them or going under them. It is probable that the latter mode was the most convenient, and there is no evidence that in so doing he incurred any greater risk. The wires were visible, and to all appearances were safe. The great force that was being carried over the wire gave no evidence of its existence. There was no means for a man of ordinary education to distinguish whether the wire was dead or alive. It had all the appearance of having been properly insulated. From this fact there was an invitation or inducement held out to Clements to risk the consequences of contact. He had a right to believe they were safe, and that the company had complied with its duties specified by law. He was required to look for patent and not latent defects. Had he known of the defective insulation, and put himself in contact with the wire, he would have assumed the risk. The defect was hidden, and the insulation wrapping was defective. It is certain, had it been properly wrapped, Clements would not have been killed. His death is conclusive proof of the defect of the insulation and the negligence of the defendant. He exercised reasonable care in going under the wire in the performance of his duty, as he had a right to believe, from external appearances, that the wire was safe. His action was such as not to tend to expose himself directly to the danger which resulted in the injury. In fact, there was no apparent danger.

"Even in the presence of a known danger, to constitute contributory negligence, it must be shown that the plaintiff voluntarily and

unnecessarily exposed himself to it, unless it is of that character that the plaintiff must assume the risk from the very nature of the danger to which he is exposed. From the appearance of the wire, its wrapping with insulating tape, and the known duty of the defendant to protect the insulation at this particular splice or joint, Clements had no reason to anticipate danger, except from the fault of the defendant company. This fault was the cause of his death, and his act in passing under or over the wire was too remote to give it the character of contributory negligence.'' (*Clements* v. *L. E. L. Co.,* 16 L. R. A., 44 and 45. See also *Davies* v. *Mann,* 19 Eng. Rul. Cases, 190.)

This Louisiana case, from which such an extensive quotation has been made, is quite similar to the case before us and may be regarded as settling the question of contributory negligence favorably to the appellant. We certainly so regard it and will follow it accordingly.

The respondent, while relying mainly on the opinion of the trial court to sustain the judgment rendered, refers us to two of our own decisions as supporting the position taken in sustaining the motion for nonsuit. We do not so regard them. The case of *García* v. *S. J. L. & T. Co.,* decided by our Supreme Court on May 23, 1911 (17 P. R. R., 595), and cited by respondent, is one of contributory negligence, but the facts are entirely different from the case at bar and it cannot be considered as an authority in the decision of this case for that reason. The case of *Díaz* v. *S. J. L. & T. Co.,* also cited by respondent, and decided by us on January 20, 1911 (17 P. R. R., 64), is clearly against the position taken on this appeal, and goes farther to sustain the plaintiff's claim than in any other direction. Then the law, as we understand it, as well as the facts of this case as shown in the record, is against the contributory negligence of the deceased would bar the plaintiff from a recovery.

The view taken by the trial court that Rodríguez was merely a licensee does not alter the duty which the defendant owed to him as a constituent part of the general public. Public service corporations, enjoying special privileges and valuable franchises, are bound to discharge their duties to

other companies, their employes, and the people generally in such a way as reasonably to prevent injuries resulting from the dangerous elements employed in their daily business. To leave this connection open for seven years, without inspection, until the covering of the wires had become rotten and peeled off, and to allow a deadly current to pass over it continually to the peril of any and all persons who might chance to come in contact with it, is carelessness scarcely short of criminal, much less excusable in any degree.

A motion for a new trial was duly filed in this case and overruled for the same reasons which were assigned as the grounds on which the judgment was based. An appeal was promptly taken from this order. As this motion for a new trial was based on allegations of the insufficiency of the evidence to sustain the findings and conclusions of the court, and that the decision of the case was contrary to the law, and that errors of law had been committed by the court on the trial, the questions presented therein have all been discussed and decided in considering the appeal taken from the judgment, and we need take no further consideration of the motion for a new trial than to say that it should have been granted.

Then, applying the existing law, regarding personal injuries resulting in death, to the facts proven on this trial, we are clearly of the opinion that there was a great error committed by the District Court of Ponce in rendering the judgment herein appealed from, and that the same should be reversed and the cause remanded to the court below with instructions to hold another trial hereof, to be conducted in accordance with this opinion.

*Judgment reversed and new trial granted.*

Chief Justice Hernández and Justices del Toro and Aldrey concurred.

Mr. Justice Wolf signed stating that he concurred in the judgment.